USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/21/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOROS ADVISORS LLC,

                    Plaintiff,                    17-cv-7514 (JGK)

        - against -                               OPINION & ORDER

DIGITALGLOBE, INC.,

                    Defendant.

JOHN G. KOELTL, District Judge:

The plaintiff, Foros Advisors LLC ("Foros"), a financial
advisory boutique, brings this action against Digitalglobe, Inc.
("DGI") for breach of contract, quantum meruit, and unjust
enrichment. The plaintiff and defendant were parties to an
Engagement Letter under which the plaintiff was to provide
financial advisory services for a reduced fee with the
expectation that the defendant would offer the plaintiff the
opportunity to act as a financial advisor to DGI on any
resulting acquisition or other strategic transaction. Foros
alleges that it provided the financial advisory services and was
paid the reduced rate for its services but was never offered the
opportunity to become a financial advisor in connection with the
strategic transaction that ensued. DGI moves to dismiss the
Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure for failure to state a claim upon which
relief can be granted.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession

or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The following facts are taken from the Amended Complaint and are accepted as true for the purposes of the defendant's motion to dismiss.

Foros is a limited liability, strategic financial advisory boutique. Am. Compl. ¶ 8. DGI is a commercial provider of satellite imagery. Am. Compl. ¶ 13.

In the early part of 2015, DGI was allegedly "struggling to grow its revenues" and investors had expressed concern with the business. Am. Compl. ¶ 14. At that time, DGI had "aspects of a satellite business, a government contractor, and an information services business" and was allegedly "suffering from an identity crisis in the marketplace". Am. Compl. ¶ 15. In order to address these issues, DGI engaged Foros as a financial advisor in mid-2015. Am. Compl. ¶ 16. DGI sought Foros's assistance to develop long term strategies for the company, including "identifying the key drivers for those strategies, understanding their financial implications, and establishing a clear market profile." Am. Compl. ¶ 16.

On August 1, 2015, Foros and DGI signed an Engagement Letter setting forth the services Foros would provide. Am. Compl. ¶ 18. The Engagement Letter explained that Foros would assist DGI "in the review of [DGI's] strategic plan and development of an acquisition strategy and framework for evaluating acquisition opportunities and such other matters as [Foros and DGI] may agree." Am. Compl. ¶ 18. For its work pursuant to the Engagement Letter, Foros would receive a $250,000 retainer fee for the first three months of work and $125,000 per quarter for work completed thereafter, commencing on November 1, 2015. Am. Compl. Ex. A, at 2. The Engagement Letter also contained a clause (the "Offer Clause") which read:

> If [DGI] determines to consider any acquisitions or other strategic transactions as a result of this engagement during the term of this Agreement or during the 18-month period following the termination of this Agreement, [DGI] will offer Foros the opportunity to act as a financial advisor to the company in connection therewith, and, if offered, Foros agrees to consider acting in such capacity. If Foros agrees to act in any such capacity for a particular transaction, [DGI] and Foros (or an affiliate of Foros, at its election) will enter into an appropriate form of agreement relating to the type of transaction involved and containing customary terms and conditions, including fee provisions and provisions relating to indemnification of Foros, as negotiated and agreed in good faith by [DGI] and Foros.

Am. Compl. Ex. A, at 1-2.

During the several months that followed, Foros provided "guidance to DGI on how to frame its business and categorize its

4

revenue sources" and "developed a roadmap for DGI on messaging and strategy to establish a clear market identity that would better position DGI as a candidate for investors." Am. Compl. ¶ 19. Specifically, Foros developed a financial model for DGI that allowed DGI to assess the financial impact of alternative business scenarios. Am. Compl. ¶ 21. Described as the "Sandbox," this tool "allowed dynamic financial modeling of a given business strategy based on variations to [key business and financial drivers for DGI]." Am. Compl. ¶ 21.

During its work with Foros, DGI expressed interest in launching a "platform" business, which would be an online imagery platform that would enable others to develop applications to analyze DGI's imagery. Am. Compl. ¶ 22. DGI asked Foros to help "define what DGI's business would need to look like in order to be viewed as a platform company." Am. Compl. ¶ 23. In response to this request, Foros developed a business strategy including financial metrics for DGI to assess the platform business idea. Am. Compl. ¶ 24. The financial model created by Foros concluded that DGI would not be able to transition profitably to the platform model without merging with another company to acquire some of the necessary capabilities. Am. Compl. ¶ 25.

In September 2015, Foros provided the DGI board of directors with final versions of three operating scenarios for

DGI, as well as financial projections. DGI management advised the board that the platform model had the most potential for DGI. Am. Compl. ¶ 27. In September and October of 2015, DGI discussed with financial sponsors a potential leveraged buyout ("LBO") of DGI. Am. Compl. ¶ 28. Throughout this process, DGI's chief financial officer and other DGI representatives communicated with Foros. Am. Compl. ¶ 28. On October 8, 2015, Foros spoke with DGI's CFO and Barclays to discuss the LBO outreach. Am. Compl. ¶ 29. DGI's CFO assured Foros that it would be a part of any advisory team if the LBO was successful. Am. Compl. ¶ 29. However, ultimately the discussions about the LBO transaction were terminated. Am. Compl. ¶ 30.

About one year later, in October 2016, DGI began discussions regarding a potential merger with MacDonald, Dettwiler and Associates Ltd. ("MDA") Am. Compl. ¶ 31. From October 2016 to February 2017, DGI and MDA continued discussions about the merger, and DGI engaged Barclays and PJT Partners LP ("PJT") to serve as the financial advisors in connection with the potential merger. Am. Compl. ¶ 33. Foros alleges that Barclays was provided with the financial model created by Foros and relied on the model in rendering its fairness opinion of the merger. Am. Compl. ¶ 37.

In January 2017, DGI and Foros had an in-person meeting. Am. Compl. ¶ 34. In February 2017, DGI requested that Foros

continue to develop the strategy initiated in 2015. Am. Compl. ¶ 34. During these meetings, DGI did not disclose to Foros that it was discussing merger opportunities with MDA or any other businesses. Am. Compl. ¶ 34. DGI never approached Foros to offer Foros the opportunity to work as a financial advisor for the MDA merger. Am. Compl. ¶ 34.

On February 24, 2017, MDA agreed to acquire DGI for approximately $3.6 billion dollars. Am. Compl. ¶ 35. Barclays and PJT received financial advisory fees of $36 million and $18 million, respectively, upon consummation of the MDA merger. Am. Compl. ¶ 35.

The plaintiff filed suit against DGI alleging that the defendant breached the Offer Clause of the Engagement Letter when DGI failed to offer the plaintiff the opportunity to act as a financial advisor to DGI on the MDA merger. The plaintiff now brings claims for breach of contract, quantum meruit, and unjust enrichment. The plaintiff seeks contract damages of not less than $18 million together with pre-judgment interest, and in the alternative, damages for its quantum meruit and unjust enrichment claims in an amount to be determined at trial.

### III.

The defendant argues that the plaintiff's claim for breach of contract must be dismissed because the Offer Clause is

7

unenforceable under the New York common law of contracts and is barred by the Statute of Frauds.

**A.**

The defendant first argues that the Offer Clause is an unenforceable "agreement to agree" under New York common law.

"It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." Candid Prods., Inc. v. Int'l Skating Union, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982) (Weinfeld, J.); see also Vian v. Carey, No. 92cv0485, 1993 WL 138837, at *3 (S.D.N.Y. Apr. 26, 1993). The New York Court of Appeals has explained that the purpose of the requirement of definiteness is twofold:

> First, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy . . . Second, the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.

Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 548
N.E.2d 203, 206 (N.Y. 1989). Courts are cautioned not to apply
the doctrine with a "heavy hand" because "[w]hile there must be
a manifestation of mutual assent to essential terms, parties
also should be held to their promises . . . ." Id.; see, e.g.,
Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 453 (2d
Cir. 1977) (holding that "many a gap in terms can be filled, and
should be [filled]").

Thus, before finding that an agreement is too indefinite,
"a court must be satisfied that the agreement cannot be rendered
reasonably certain by reference to an extrinsic standard that
makes its meaning clear." Cobble Hill, 548 N.E.2d at 206.
Methods for determining the meaning of such ambiguous terms can
be found within the agreement itself or by comparison to "an
extrinsic event, commercial practice, or trade usage." Id.; See
also John St. Leasehold LLC v. F.D.I.C., No. 95cv10174, 1998 WL
411328, at *3-4 (S.D.N.Y. July 22, 1998), aff'd, 196 F.3d 379
(2d Cir. 1999).

Specifically, "a price term may be sufficiently definite if
the amount can be determined objectively without the need for
new expressions by the parties . . . ." Cobble Hill, 548 N.E.2d
at 206. However, where missing terms cannot be substituted by
reference to an objective standard, the alleged agreement
"leave[s] no room for legal construction or resolution of

9

ambiguity" and therefore is unenforceable. Joseph Martin, Jr.,

Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 544 (N.Y.

1981).

In this case, Foros argues that DGI breached the Offer

Clause by failing to "offer Foros the opportunity to act as a

financial advisor" to DGI on the merger between DGI and MDA. Am.

Compl. ¶ 6. The Offer Clause stated:

> If [DGI] determines to consider any acquisitions or
> other strategic transactions as a result of this
> engagement . . . [DGI] will offer Foros the
> opportunity to act as a financial advisor to [DGI] in
> connection therewith . . . . If Foros agrees to act
> [as a financial advisor] for a particular transaction,
> [DGI] and Foros . . . will enter into an appropriate
> form of agreement relating to the type of transaction
> involved and containing customary terms and
> conditions, including fee provisions and provisions
> relating to indemnification of Foros, as negotiated
> and agreed in good faith by [DGI] and Foros.

Am. Compl. Ex. A, at 1.

The Offer Clause does not specify the type of financial

advisory role Foros would be offered in any future acquisition

or strategic transaction, nor does it set forth the scope of the

expected advisory role, such as the expected work product or

time commitment. The Offer Clause also does not specify the

amount of money Foros would be paid for that work. There are

plainly different types of financial advisors who provide

different services for different levels of compensation on

different types of strategic transactions. Even on the merger

between DGI and MDA, two financial advisors were employed --
Barclays and PJT -- and they were paid vastly different
compensation -- $36 million and $18 million respectively.

Without such critical terms as the type of financial
advisor, the scope of services, and the compensation, there can
be no binding agreement because the Offer Clause is merely an
agreement to agree on these material terms at a later time. See
Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC, 819
N.Y.S.2d 182, 184-85 (App. Div. 2006) (defendants' promise to
use the plaintiff as the exclusive subcontractor for certain
electrical and teledata work if the defendants were awarded the
prime contract was not enforceable because it left for later
agreement the precise nature of the work to be subcontracted, as
well as the price and manner of payment and time of
performance); see also Trianco, LLC v. Int'l Bus. Machines
Corp., 271 F. App'x 198, 202 (3d Cir. 2008) ("We find that IBM's
promise to grant Trianco a subcontract, subject to the parties'
future agreement on its terms, conditions, and pricing, is
merely an agreement to agree. As such, it is unenforceable under
New York law.").

The plaintiff argues that the Offer Clause is not
indefinite because the terms can be objectively determined with
reference to "customary terms and conditions". But, in this
case, customary terms and conditions cannot be used to determine

the meaning of the ambiguous terms because the Offer Clause does not even define the specific type of financial advisor that Foros would be, or the scope of services to be performed, much less an objective or customary standard for determining the amount such an advisor would be paid. The vastly different amounts paid to Barclays and PJT is evidence of the wide range of advisory services available in any particular transaction and the compensation paid for those services. Thus, the plaintiff has not shown that there is a customary standard the court could use to determine objectively the terms intended by the parties. See KJ Roberts & Co. Inc. v. MDC Partners Inc., No. 12cv5779, 2014 WL 1013828, at *10 (S.D.N.Y. Mar. 14, 2014), aff'd, 605 Fed. App'x 6 (2d Cir. 2015) ("[I]n order for a court to supply an omitted contract term using 'custom and usage evidence,' the plaintiff 'must establish that the omitted term is fixed and invariable in the industry in question.'").

None of the cases cited by the plaintiff counsel a different result. In Cowen & Co., LLC v. Fiserv, Inc., 31 N.Y.S.3d 494, 495 (App. Div. 2016) the parties had agreed that the plaintiff would be engaged to act as "lead financial advisor" to the defendant in connection with a possible acquisition and the "Transaction Fee" would be "consistent with investment banking industry practice for transactions of comparable complexity, level of analysis and size". Id. at 495.

The contract specifically defined the type of transaction (a proposed acquisition) and the type of financial advisor (lead financial advisor). The agreement also specified the means for determining the compensation for that role. The Court in Cowen & Co. was thus able to use public price indices and industry practice to determine a definite amount of compensation for that role. Here, there is no such specificity in the Offer Clause, and thus no comparable standard for the Court to apply. Moreover, unlike the agreement in Cowen & Co., the Offer Clause in this case fails to identify what financial advisory role the parties intended Foros to play.

In Cobble Hill, the parties agreed to a contract that contained an option for the plaintiff to purchase property it was leasing from the defendant. The contract set forth that the price for exercising the purchase option would be a "price determined by the Department of Health in accordance with the Public Health Law and all applicable rules and regulations of the Department . . . ." Cobble Hill, 548 N.E.2d at 204. Those regulations set forth a specific method by which the Department of Health could compute the purchase price, and the Department in fact calculated the price by reference to those rules and regulations. Id. at 205, 207. The only question of indefiniteness in Cobble Hill was the determination of the price and not, as in this case, the nature and scope of contractual

duties as well as the price. In <u>Cobble Hill</u>, the Department of Health regulations provided a definite way by which the contract price could be set -- something the Offer Clause in this case fails to do.

Finally, in <u>Bear Sterns</u>, the Court enforced a contract in which the plaintiff agreed to act as the defendant's "exclusive agent for the purpose of exploring real estate options" in return for compensation that would be "in accordance with customary rates for the industry in general." <u>Kenneth F. Laub & Co. v. Bear Sterns Cos., Inc.</u>, 692 N.Y.S.2d 30, 31 (App. Div. 1999). Unlike in this case, the contract in <u>Bear Sterns</u> clearly and specifically defined the terms of the work to be done by the plaintiff -- the plaintiff would be the defendant's "exclusive agent" for the purpose of exploring various real estate options. Here, the Offer Clause does not specify the type of advisory work Foros would perform nor the scope of its work in the transaction.

The plaintiff also argues that, at a minimum, the Offer Clause constitutes a binding agreement to negotiate in good faith.

"[P]arties can bind themselves to a concededly incomplete agreement in the sense that that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." <u>Teachers Ins. & Annuity Ass'n v. Tribune Co.</u>, 670 F.

14

Supp. 491, 498 (S.D.N.Y. 1987). However, "[w]hether a provision in a preliminary agreement obligating the parties to negotiate in good faith is enforceable depends on the materiality of the terms remaining to be negotiated and the degree to which the content of the remaining terms can be discerned from the preliminary agreement." Ward v. Pricellular Corp., No. 90cv5214, 1991 WL 64043, at *6 (S.D.N.Y. Apr. 16, 1991). "If an agreement leaves a material term open for future negotiation and provides no indication of the parties' intent regarding that term, a provision obligating the parties to negotiate that term in good faith is a mere 'agreement to agree,' which is too indefinite to be enforced." Id.

Here, as discussed above, the Offer Clause plainly leaves open material terms, namely the type of financial advisory role Foros would play in any subsequent merger, the scope of the work, and the amount of compensation to be paid to Foros for that work. Because these material terms are missing and there is no way for the court to fill in the missing terms with reference to an objective standard, the Offer Clause is merely an "agreement to agree" and cannot be an enforceable agreement to negotiate in good faith. See Yan's Video, Inc. v. Hong Kong TV Video Programs, Inc., 520 N.Y.S.2d 143, 145 (App. Div. 1987)(agreement to negotiate in good faith to renew agreement

upon terms and conditions to be negotiated is nothing more than

an agreement to agree and is not enforceable).

**B.**

The defendant also argues that the plaintiff's claim for

breach of contract should be dismissed because the Offer Clause

fails to satisfy New York's Statute of Frauds.

Under the New York Statute of Frauds:

> Every agreement, promise or undertaking is void, unless
> it or some note or memorandum thereof be in writing, and
> subscribed by the party to be charged therewith, or by
> his lawful agent, if such agreement, promise or
> undertaking: . . . 1. By its terms is not to be performed
> within one year from the making thereof; . . . . 10. Is
> a contract to pay compensation for services rendered in
> negotiating . . . [the sale of] a business . . .
> including a majority of the voting stock interest in a
> corporation . . . .

N.Y. Gen. Oblig. Law § 5-701(a)(1), (10). "To be considered a

sufficient memorandum within the ambit of the Statute of Frauds,

a writing 'must designate the parties, identify and describe the

subject matter and state all the essential or material terms of

the contract.'" Allied Sheet Metal Works, Inc. v. Kerby

Saunders, Inc., 619 N.Y.S.2d 260, 262 (App. Div. 1994) (quoting

Villano v. G & C Homes, Inc., 362 N.Y.S.2d 198, 200 (App. Div.

1974)). See also Mercator Corp. v. Windhorst, 159 F. Supp. 3d

463, 471-72 (S.D.N.Y. 2016).

The Offer Clause obligates DGI to offer Foros an

opportunity to be a financial advisor to DGI in "any . . .

16

strategic transactions" DGI enters into "during the term of the Agreement or during the 18-month period following the termination of the Agreement." Am. Compl. Ex. A, at 1. The obligations in the Offer Clause necessarily extend for more than 18 months from the date of the Engagement Letter and the contract therefore cannot be performed within one year of its making. The Offer Clause is thus subject to the Statute of Frauds pursuant to New York General Obligations Law § 5-701(a)(1). See D & N Boening v. Kirsch Beverages, 472 N.E.2d 992, 994-95 (N.Y. 1984); Polykoff Advertising, Inc. v. Houbigant, 374 N.E.2d 625 (N.Y. 1978).

The Offer Clause is also subject to the Statute of Frauds pursuant to New York General Obligations Law § 5-701(a)(10) which states that any agreement to "pay compensation for services rendered in negotiating . . . [the sale of] a business" is subject to the Statute of Frauds. N.Y. Gen Oblig. Law § 5-701(a)(1). "Negotiating" is defined by the statute to "include [] procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." Id. Foros's claim for breach of contract seeks "a customary fee for serving as a financial advisor in connection with the MDA Merger and other potential transactions." Am. Compl. ¶ 45. Such a claim for a "fee" for assistance relating to the sale of a business falls within this

17

provision of the Statute of Frauds. See Whitman Heffernan Rhein & Co. v. Griffin Co., 557 N.Y.S.2d 342, 343 (App. Div. 1990) ("[T]he services to be rendered by [the financial advisor], in assisting [the defendant] in evaluating and analyzing the proposed acquisition and providing consultant services, fall within the ambit of the Statute of Frauds, General Obligation law § 5-701(a)(10).").

Foros does not dispute that the alleged contract must satisfy the Statute of Frauds. It contends that the Engagement Letter is a sufficient writing to satisfy the Statute of Frauds. However, the Offer Clause does not state all essential or material terms of that alleged agreement. It does not include a price term or the type of advisory role Foros would play in the transaction or the scope of Foros's responsibilities. Accordingly, it fails to satisfy the Statute of Frauds. Carruthers v. Flaum, 450 F. Supp. 2d 288, 308 (S.D.N.Y. 2006) (to satisfy the Statute of Frauds the writing must "state all of the essential terms of a complete agreement" (quoting Wacks v. King, 689 N.Y.S.2d 298 (App. Div. 1999))); see also Bright Beginnings Day Care, Inc., v. Driftwood Day camp, Inc., 791 N.Y.S.2d 624, 624 (App. Div. 2005) ("The Supreme Court properly granted summary judgment to the defendants because the right of first refusal, which omitted essential terms and left terms open for

future negotiation, was unenforceable under the statute of frauds[.]").

Consequently, the defendant's motion to dismiss the plaintiff's claim for breach of contract is **granted**.

## IV.

The plaintiff also alleges claims for quantum meruit and unjust enrichment, seeking the difference in value between the work the plaintiff performed and the rate at which it agreed to perform that work. The defendant argues that these claims must be dismissed because the Engagement Letter fully governs the plaintiff's right to compensation for the services the plaintiff provided.

## A.

Under New York law, quantum meruit and unjust enrichment claims may be considered together as a "single quasi contract claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation omitted). "To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Old Republic Nat'l Title Ins. Co. v. Luft, 859 N.Y.S.2d 261, 262 (App. Div. 2008). To recover in quantum meruit, the plaintiff must show "(1) the performance of services

19

in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000). See also Gameologist Grp., LLC v. Sci. Games Int'l, Inc., 838 F. Supp. 2d 141, 167 (S.D.N.Y. 2011), aff'd, 508 Fed. App'x 31 (2d Cir. 2013).

"The existence of a valid contract precludes quasi-contract claims, because they serve as equitable remedies that operate where no valid contract exists." Rojo v. Deutsche Bank, No. 06cv3574, 2010 WL 2560077, at *6 (S.D.N.Y. June 23, 2010), aff'd, 487 Fed. App'x 586 (2d Cir. 2012); see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

Foros claims that the possibility of contracting with DGI again -- as contemplated by the Offer Clause -- was part of the consideration DGI agreed to provide Foros in exchange for Foros's services. Foros claims that the compensation for the work it performed was paid at a reduced rate because of its expectation to receive payment for future advisory services that it did not get. Because DGI never offered Foros the opportunity

20

to serve as a financial advisor in its merger with MDA, Foros contends that it is entitled to additional compensation for the work that it performed under the Engagement Letter. However, the Offer Clause contemplated the possibility of the parties entering into a future contract, separate and distinct from the Engagement Letter, which would provide compensation for different work beyond that performed under the Engagement Letter. Therefore, the fact that the Offer Clause is invalid does not deprive Foros of compensation for the work it has already performed at the rate that Foros agreed to in the Engagement Letter. The quasi-contract claims must therefore be dismissed.

Foros argues that an unpublished opinion from the Second Circuit Court of Appeals requires this Court to hold otherwise. That case, Mem'l Drive Consultants, Inc. v. ONY, Inc., involved a contract with multiple compensation clauses, each designed to compensate the plaintiff for work performed under different phases of the contract. 29 F. App'x 56, 58 (2d Cir. 2002) (summary order). One of the compensation clauses at issue was held to be an unenforceable agreement to agree. Id. at 60-61. Under that clause, the defendant was to compensate the plaintiff for work the plaintiff had already performed "in an equitable manner." Id. at 58. The invalid clause in Mem'l Drive Consultants was expressly related to compensation for work that

the plaintiff had performed under the contract. Id. In that situation, the fact that the contract claim was invalid left the plaintiff without compensation for work it provided under one phase of the agreement, and the court of appeals affirmed the district court's decision to allow a quasi-contract claim to move forward for that phase of the work. Unlike the invalid clause in Mem'l Drive Consultants, the Offer Clause here does not purport to provide compensation for the work Foros actually performed under the contract. Foros was compensated for its work under the Engagement Letter at the rate it agreed to perform that work. Therefore, the fact that the Offer Clause is unenforceable does not leave Foros deprived of compensation for the services it performed.

Indeed, the only provisions of the Engagement Letter that purport to compensate Foros for the services it performed remain valid. The Engagement Letter specifically sets out the compensation due to Foros for the services Foros provided. The Engagement Letter states that, for Foros's services under the contract, DGI will pay "a retainer fee, equal to $250,000 . . . for the Strategic and Acquisition Review Work . . . and thereafter ongoing retainer fees of $125,000 per quarter." Am. Compl. Ex. A, at 2. In exchange for that compensation, Foros agreed to "perform the work set out in the Work Plan . . . create a framework for consideration of acquisition

opportunities; and . . . make a presentation to [DGI's]

Management . . . regarding the foregoing, including its analysis

and recommendations, the form and content of which shall be such

as Foros considers appropriate." Am. Compl. Ex. A, at 1. Foros

does not dispute that it was compensated for providing its

services according to the schedule provided in the Engagement

Letter.[1]

Accordingly, the Engagement Letter bars the Plaintiff's

quasi-contract claims because "the scope of the [Engagement

Letter] clearly covers the dispute between the parties." Mid-

Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,

418 F.3d 168, 175 (2d Cir. 2005). Foros has not shown that it

performed any additional services that were "so distinct from"

its contractual duties that "it would be unreasonable for [DGI]

to assume that they were rendered without expectation of further

pay." Id. at 175-76 (quoting U.S. E. Telecomms. v. U.S. West

Commc'ns Servs., 38 F.3d 1289 (2d Cir. 1994)); see also

---

[1] Though Foros contends that it provided its services at a
discounted rate in hopes of contracting with DGI again in the
future, "a claimant is not entitled to recover in quantum meruit
when services have been rendered with the expectation that a
future business opportunity or contract -- rather than direct
compensation -- will be forthcoming." Anderson v. Iceland
Seafood Corp., 77 F.3d 480, 480 (5th Cir. 1996) (per curiam). If
Foros agreed to perform that work at a reduced rate, it was
nonetheless the rate at which Foros agreed to perform the work
that it did perform. Foros cannot use quasi-contract claims to
renegotiate the rate to which it agreed.

Hindsight Sols., LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 774
(S.D.N.Y. 2014). Indeed, the work Foros performed was exactly
that which the Engagement Letter explicitly required of it, and
for which the specific amount of compensation is also set forth
in the Engagement Letter. The fact that the Offer Clause is
unenforceable does not provide Foros the ability to renegotiate
the rate for the work that it performed pursuant to the
Engagement Letter.

Accordingly, the Engagement Letter, an enforceable
contract, governs the compensation that DGI owed Foros. Because
the Engagement Letter covers the work that was done and for
which Foros received compensation, Foros cannot sue in
quasi-contract for additional compensation beyond what it
negotiated for in the Engagement Letter. Foros's quasi-contract
claims for quantum meruit and unjust enrichment must be
**dismissed.**[2]

---

[2] Moreover, the additional work to be negotiated under the Offer
Clause was itself barred by the Statute of Frauds. The fact that
the provision of the Engagement Letter relating to the future
engagement of Foros as a financial advisor is unenforceable and
is barred by the Statute of Frauds does not somehow allow that
provision to become enforceable under a quasi-contract theory.
Indeed, claims for quantum meruit and unjust enrichment cannot
be used to circumvent the Statute of Frauds. Bonsey v. Kates,
13cv2708, 2013 WL 4494678, at *7 (S.D.N.Y. Aug. 21, 2013);
William Morris Endeavor Entm't, LLC v. Rivera, 990 N.Y.S.2d 441
(Sup. Ct. 2014).

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, DGI's motion to dismiss is **granted**. The Clerk is directed to close Docket No. 30.[3]

**SO ORDERED.**

Dated:    **New York, New York**
           **September 21, 2018**

                                    **John G. Koeltl**
                      **United States District Judge**

---

[3] In its motion papers, Foros did not seek leave to file an amended complaint, but at the argument of the motion, Foros indicated that it might seek to file an amended complaint. Any motion to file an amended complaint must be filed within twenty-one days of the date of this Opinion together with a copy of the proposed amended complaint. If no such motion is filed, the Clerk will be directed to enter a Judgment dismissing this case with prejudice.